IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**UNITED STATES OF AMERICA**,

v.

**RYAN GERARD GRIFFIN**,

Defendant.

Case No. 3:17-cr-235-01-SI

**OPINION AND ORDER**

**Michael H. Simon, District Judge.**

The parties dispute the correct advisory sentencing guidelines range for Defendant Ryan Griffin under the United States Sentencing Guidelines ("U.S.S.G."). This Opinion and Order resolves that dispute.

## STANDARDS

### A. United States Sentencing Guidelines

Sentencing begins with a properly calculated advisory sentencing guidelines range. *Gall v. United States*, 552 U.S. 38, 39 (2007); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The advisory sentencing guidelines serve as the initial benchmark in every sentencing proceeding, *Gall*, 552 U.S. at 39, and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007). The sentencing

table in the guidelines presents a defendant's offense level in the vertical axis and a defendant's criminal history category in the horizontal axis. Both the offense level and the criminal history category must be correctly calculated, and the intersection yields the advisory guidelines range. After calculating the advisory guidelines range, the Court must consider that range, along with all of the other sentencing factors listed in 18 U.S.C. § 3553(a) before arriving at a final sentence.

The U.S.S.G. directs that the court consider all "relevant conduct" when evaluating the nature and circumstances of the offense to determine the correct offense level. U.S.S.G. § 1B1.3. The U.S.S.G. defines "relevant conduct," in part, as follows:

> <u>Relevant Conduct (Factors that Determine the Guideline Range)</u>
>
> (a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
>> (1) (A) *all acts and omissions committed*, aided, abetted, counseled, commanded, induced, procured, or willfully caused *by the defendant*; and
>>
>> (B) * * *
>>
>> *that occurred during the commission of the offense of conviction*, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>>
>> (2) * * *
>>
>> (3) *all harm that resulted from the acts and omissions specified in subsections (a)(1)* and (a)(2) above, *and all harm that was the object of such acts and omissions*; and
>>
>> (4) * * *

U.S.S.G. § 1B1.3(a) (emphasis added). In addition, the United States Sentencing Commission provides the following Commentary for this subsection: "Conduct that is not formally charged *or is not an element of the offense of conviction* may enter into the determination of the applicable guideline sentencing range." U.S.S.G. §1B1.3, comment. (background) (emphasis added).

**B. Standard of Proof**

"District courts generally use the preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud. The higher 'clear and convincing' standard may apply, however, when a sentencing factor has an *extremely* disproportionate effect on the sentence relative to the offense of conviction." *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (emphasis added) (citations and quotation marks omitted).

**C. Evidence that May Be Considered**

The Federal Rules of Evidence do not apply in a sentencing proceeding. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . sentencing"). As noted by the United States Supreme Court, "18 U.S.C. § 3661 . . . codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997). That statute provides:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. Unlike the strict evidentiary restrictions applicable at trial, the only evidentiary requirement at sentencing is that the sentence be based on information that has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. *See United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001) (holding that for sentencing purposes, hearsay

testimony need only "be accompanied by some minimal indicia of reliability") (quotation marks omitted).

## BACKGROUND

Defendant Ryan Griffin ("Griffin") was born in 1971. In 2017, at the time of the offense, he was about to turn 46. Griffin is the son of Gerald Griffin, who passed away in 2007, and Gretchen Holce. Griffin's parents divorced when Griffin was in the sixth grade. Griffin's mother later married Thomas Holce, who passed away in 2013. Codefendant Valerie Lindsay Marchant ("Marchant") was born in 1975.

Gretchen Holce and Thomas Holce were art collectors. They had several fine art paintings in their residence, including a painting by American artist Tom Wesselmann, titled *Study for Monica with Tulips*. The medium was Liquitex on Brostol board, and the dimensions were 13 by 17 inches. The painting was signed and dated "Wesselmann 88." The painting was later silkscreened in color and a limited run of 100 prints were prepared. Wesselmann died in 2004 and was associated with the New York Pop Art movement, which includes Roy Lichtenstein and Andy Warhol. Gretchen and Thomas Holce purchased their Wesselmann painting from Jeffrey Wilkey, who had previously purchased it from the Sidney Janis Gallery.

In March 2007, Tom and Gretchen Holce obtained a formal appraisal of the Wesselmann painting. The painting's appraised value was $90,000. According to the appraisal, the painting's value is "listed for insurance purpose [sic] based on replacement cost or at the current retail value." Gretchen Holce estimates that the value of the painting has increased by approximately $10,000 to $15,000 since the 2007 appraisal. Until Gretchen Holce received a telephone call on May 30, 2017, from the former owner of the painting, Jeffrey Wilkey, she had not realized that the artwork was missing from her residence.

On May 9, 2017, a man identifying himself as "Jeffrey White" (later determined to be Defendant Griffin) contacted the Hollis Taggart Galleries in New York City. This art gallery previously had posted a Google advertisement, indicating that they were interested in purchasing artwork by Tom Wesselmann. Griffin, posing as "Jeffrey White," told the art gallery that he had Tom Wesselmann's painting *Study for Monica with Tulips* available for sale. The gallery prepared its standard paperwork for such a sale and mailed a box for the painting to "Jeff White" at a hotel in Portland, Oregon. The gallery also purchased insurance to cover the painting for a value of $85,000 and agreed to purchase the painting from "Jeff White" for $60,000, if the painting was lost or destroyed. The art gallery mailed the box for the painting to "Jeff White" on May 12, 2017.

On May 16, 2017, the gallery received the painting in the box provided to "Jeff White." The gallery tested the work for authenticity and found it to be authentic and in excellent condition. The gallery valued the work at $110,000 and ultimately agreed to purchase it for $52,000. The gallery sent several emails to Griffin, who was using the alias "Jeff White." Griffin responded with telephone calls to the gallery. On May 18, 2017, however, Griffin was arrested in Oregon on unrelated state drug and theft charges.

From May 21 through May 26, 2017, Codefendant Marchant, using the alias "Jennifer Loree," communicated by email with the Hollis Taggart art gallery in New York. "Loree" was seeking to complete the sale of the Wesselmann painting of behalf of "White." Through an email sent on May 26, 2017, "Loree," now representing herself as "Valerie Marchant," requested that the Hollis Taggart art gallery pay for the painting with a check in the amount of $52,000 payable to "Valerie Marchant." In that email, Marchant represented herself to be one of "Loree's nearest

and dearest friends and financial advisor." At the time, Griffin was in state custody on unrelated charges. The Hollis Taggart art gallery then contacted the FBI.

On May 30, 2017, Gretchen Holce received a call about the painting from its former owner, Jeffrey Wilkey. Holce also learned from the Hollis Taggart art gallery that a person named "Valerie" was involved in this matter. Holce explained that she assumed that the "Valerie" referenced by the art gallery was Valerie Marchant, as associate of her son, Ryan Griffin. Holce met with an FBI Special Agent on May 30, 2017, and stated that she had a Tom Wesselmann painting titled *Study for Monica with Tulips* that was missing from her residence. Holce also explained that her late husband, Thomas Holce, had placed the ownership of all of the paintings into a trust, to be liquidated upon Gretchen Holce's death and therefore she could not sell or otherwise dispose of the painting.

Both Griffin and Marchant were arrested on a federal criminal complaint. They were later both indicated on two counts: (1) mail fraud, in violation of 18 U.S.C. § 1341; and (2) interstate transportation of stolen property, in violation of U.S.C. § 2314. Both have pleaded guilty to one count of mail fraud, and the government has agreed to dismiss the remaining count of interstate transportation of stolen property. Under the Defendants' respective plea agreements, the government has stated that it will argue that the relevant conduct for purposes of calculating the applicable United States sentencing guideline range should include an offense level increase that reflected an intended loss that exceeds $150,000 (the government's asserted value of the Tom Wesselmann painting), while each Defendant is free to contest the amount of the intended loss, including challenging the government's valuation of the painting.

## DISCUSSION

The government, Defendant Griffin, and the U.S. Probation Office all agree that the relevant guidelines for a violation of 18 U.S.C. § 1341 are found at U.S.S.G. § 2B1.1. Under

PAGE 6 – OPINION AND ORDER

U.S.S.G. § 2B1.1(a)(1), the base offense level is seven. The government and Defendant Griffin, however, disagree over the application of the specific offense characteristics for the intended loss calculation. The government contends that the fair market value of the Tom Wesselmann painting at issue exceeds $150,000 (but does not exceed $250,000), thus requiring an increase of ten in the offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(F). Defendant Griffin contends that the fair market value of the painting is more than $40,000, but not more than $95,000, thus requiring an increase of only six in the offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(D).

In the Presentence Report ("PSR"), the U.S. Probation Office disagrees with both the government and Defendant Griffin regarding the market value of the painting, but ultimately agrees with Griffin's calculation of the sentencing guideline range for other reasons. The Probation Office notes that the artwork at issue "was appraised by the art gallery at $110,000 at the time of the instant office." PSR, ¶ 13, 29, 35 (ECF 71). The Probation Office adds, however: "The object of the instant offense was the fraudulent acquisition of funds from the gallery. The intended loss to the gallery is therefore the $52,000 payment that the defendant sought." *Id*.

For purposes of calculating the correct sentencing guideline level, there are three questions that the Court must resolve:

    (1)    How is "loss" defined under the Guidelines?

    (2)    For purposes of calculating the intended loss, does the Court look only from the perspective of the specific victim of the crime of conviction (*i.e.*, the New York art gallery, which is the only victim of the crime of mail fraud), or may the Court also consider all harm and intended harm that resulted from all acts committed by Defendant Griffin that occurred during the commission of the offense of conviction?

    (3)    After answering questions (1) and (2), what is the correct specific offense characteristic increase under U.S.S.G. § 2B1.1(b)(1)?

## A. The Concept of Loss under the Guidelines

The offense of conviction is mail fraud, in violation of 18 U.S.C. § 1341. As previously stated, all parties agree that the relevant offense guideline is determined under U.S.S.G. § 2B1.1. All parties also agree that the base offense level is seven under U.S.S.G. § 2B1.1(a)(1) and that the only relevant specific offense characteristic is the intended loss value under U.S.S.G. § 2B1.1(b)(1). The parties disagree only over the correct measurement of the intended loss under subsection (b)(1).

Application Note 3 offer guidance. It provides, in relevant part:

> <u>Loss Under Subsection (b)(1)</u>.—This application note applies to the determination of loss under subsection (b)(1).
>
> (A) <u>General Rule</u>.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
>  (i) <u>Actual Loss</u>.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
>  (ii) <u>Intended Loss</u>.—"Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
>
>  (iii) <u>Pecuniary Harm</u>.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.
>
>   \* \* \*
>
> (B) <u>Gain</u>.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.
>
> (C) <u>Estimation of Loss</u>.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon

> that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).
>
> The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:
>
>> (i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.
>
> * * *

U.S.S.G. § 2B1.1(b)(1), comment. (n. 3).

For purposes of the pending case, the intended loss is the pecuniary harm that the defendant purposely sought to inflict, and the pecuniary harm consists only of the harm that is monetary or that otherwise is readily measurable in money. Finally, the estimate of the loss may be based on the fair market value of the property unlawfully taken or the cost to the victim of replacing that property. This, however, still leaves open several questions. Does "fair market value" imply the price the owner of the painting that was stolen would have received by selling it to an art gallery, or does it mean that price that the art gallery would have received by reselling the painting, which would include the art gallery's profit and overhead? Also, who is the victim—the art gallery or the owner of the painting that was stolen? If the only relevant victim is the specific victim of the crime of conviction (mail fraud), then the victim would be the art gallery. If, however, one considers the owner of the painting that was stolen also to be a victim (albeit of a different crime), then Holce (or, more precisely, the trust) is a victim of Griffin's crime as well. The Court turns to that issue next.

**B. Whether the Court Is Limited to the Specific Victim of the Crime of Conviction**

Application Note 3 advises that the loss is the greater of the actual loss that resulted from the offense or the intended loss that the defendant purposely sought to inflict. The note, however,

PAGE 9 – OPINION AND ORDER

does not answer the question of "resulted to whom," or relatedly "inflicted on whom"? The case law cited by the government and Defendant Griffin does not directly answer this question.

The government cites *United States v. Choi*, 101 F.3d 92, 93 (9th Cir. 1996). In that case, the defendant pleaded guilty to possession of stolen goods, in violation of 18 U.S.C. § 659. The defendant stole the goods from a freight carrier. The fair market value of the stolen goods was approximately $350,000, but the carrier's liability was contractually limited to approximately $3,000. In affirming the district court's decision to use the fair market value of the stolen goods for purposes of calculating the applicable federal sentencing guideline range, the Ninth Circuit noted that the freight carrier may have only been liable for $3,000, but had the property not been recovered, the manufacturers that owned the goods would have lost the difference between the market value and the carrier's liability amount. This difference, combined with the contractual liability amount, is the actual replacement value, which is equal to the market value. Although the defendant stole the goods from the custody of the freight carrier, the manufacturers were the owners of the goods and they were the parties who actually suffered from the defendant's crime. When a person steals property belonging to another, even from the custody of a third party, the owner of the property is the victim. Thus, measuring the loss from the perspective of the victim in *Choi* is not particularly controversial—or helpful to the pending dispute.

Defendant Griffin cites *United States v. Pemberton*, 904 F.2d 515 (9th Cir. 1990), *United States v. Silva*, 21 F.3d 1118 (9th Cir. 1994) (unpublished), and *United States v. Tidwell*, 191 F.3d 976 (9th Cir. 1999). After a jury trial, the defendant in *Pemberton* was convicted of receiving stolen property, in violation of 18 U.S.C. § 662. The stolen property included drawings prepared by a landscape architect that were 80 percent complete when stolen. The architect had been commissioned to prepare these drawing for $140,000. For purposes of calculating the

applicable federal sentencing guideline range, the district court valued the stolen property at $118,400, which was 80 percent of $140,000. The Ninth Circuit affirmed the district court's calculation, and rejected the defendant's argument that because the drawings were worthless to him, they had no value for purposes of any sentencing enhancement. The Ninth Circuit cited U.S.S.G. § 2B1.1, comment. (nn. 2, 3) (made applicable to § 2B1.2 by § 2B.1.2, comment. (n. 2)). Like *Choi*, the victim in *Pemberton* was the architect whose drawings were stolen. Thus, it is not particularly controversial in *Pemberton* to measure the relevant loss from the perspective of what the architect lost.

In *Silva*, the defendant pleaded guilty to interstate transportation of six stolen bank checks. The defendant provided a codefendant with other stolen checks. The district court increased the defendant's base offense level under U.S.S.G. § 2B1.2 because the total of all checks was more than $500,000. The Ninth Circuit affirmed, citing U.S.S.G. § 2B1.1, comment. (n. 2) (1992) (stating that in a case of the theft of a check, the loss is the loss that would have occurred if the check had been cashed). The Ninth Circuit also cited *Pemberton* for the proposition that the value of stolen property is not limited by its worth to the defendant. Similarly, the relevant loss for the crime of transportation of stolen checks in *Silva* is the value of what the issuing bank would have had to pay.

Finally, in *Tidwell*, after a jury trial, the defendant was convicted of conspiracy, illegal trafficking in Native American cultural items, theft of tribal property, and trafficking in unlawfully removed archaeological resources. The district court enhanced the defendant's sentence based on the amount of the loss. The district court valued the stolen Native American masks at the prices that the defendant asked the undercover agent to pay for them. The Ninth Circuit, citing *Choi* and *Pemberton*, held that the district court's calculation of loss was not

clearly erroneous. Defendant Griffin appears to rely on this case for the proposition that the appropriate measure of loss is the price offered to the defendant. In *Tidwell*, however, there is no indication or argument that the offered price was not the fair market price. In other words, there was no contrary evidence presented in *Tidwell* regarding any other value to the owners of the property. Thus, *Tidwell* is not particularly helpful. More importantly, *Tidwell* does not answer the question at hand: Is the loss measured only from the perspective of the specific victim of the crime of conviction?

In the pending case against Griffin, the crime of conviction is mail fraud and the only victim of that specific fraud is the New York art gallery, the Hollis Taggart Galleries, Inc. Griffin was attempting to defraud that gallery by selling it a stolen painting. The gallery ultimately had agreed (with Marchant) to pay $52,000 for the painting and intended to sell the painting for a profit. The PSR indicates that the art gallery valued the painting at $110,000. PSR ¶¶ 13, 29, 35. This is consistent with an art gallery seeking to sell a work of art at approximately two times what the gallery paid for it, *i.e.*, "keystone pricing." If the art gallery would have sold the stolen painting for that amount, or indeed for any amount, the art gallery would have had to refund the sales price to the gallery's purchaser after the fact that the painting had been stolen was discovered. The art gallery's loss would have been the $52,000 that it paid for the painting, plus whatever additional incidental costs the gallery might have incurred, the details of which have not been provided to the Court. If one looks at intended loss only from the perspective of the specific victim of the crime of conviction (*i.e.*, the New York art gallery), then the loss is $52,000 (plus perhaps some additional incidental costs). It would be incorrect to consider the loss to the art gallery to be the entire retail fair market value of the painting (which is the sales price that the gallery would have obtained by selling the painting) because the gallery would

have no legal claim to keep the profit from the sale of a stolen piece of art. Thus, all the gallery would have lost is its $52,000 payment, plus perhaps some additional incidental expenses.

On the other hand, if one considers all of the harm committed by Griffin that occurred during the commission of the offense of conviction, including conduct that is not an element of the offense of conviction, this brings in an additional victim—the owner of the painting that was stolen from the residence of Gretchen Holce, namely the trust that held legal title to the painting. In other words, Griffin's conduct was intended to result in harm not only to the New York art gallery, but also to the legal owner of the stolen painting taken from Gretchen Holce's residence. The harm done to the painting's owner (*i.e.*, the trust) is the fair market value of the painting at retail. That is the pecuniary value of the loss to the painting's owner. Although the owner might have received only $52,000 if the owner had chosen to sell the painting, nothing required the owner to sell it. On the other hand, because the owner involuntarily lost something of value, it is most appropriate to measure that value with replacement cost, which would be the amount that someone would have to pay retail to purchase that (or a comparable) painting.

Under U.S.S.G. § 1B1.3(a) and its related background commentary, the harm caused by Griffin's conduct committed during the commission of the offense of conviction should be considered in calculating the applicable offense level. *See* U.S.S.G. § 1B1.3(a) (explaining that the offense level shall be determined on the basis of all harm that resulted from the acts committed, aided, or abetted by the defendant that occurred during the commission of the offense of conviction). Because the theft of the painting from Gretchen Holce's residence is harm that falls within this description, the retail fair market value (or replacement cost) of that painting is the most appropriate measure to consider in determining the offense level under the guidelines. It would be inappropriate, however, to double-count the retail fair market value of the painting (the

loss to its owner) plus the intended loss to the New York art gallery. Accordingly, the Court will consider only the greater of those two values, which in this case is the fair market value of the painting at retail.

C. Calculating the Correct Specific Offense Characteristic Increase

    1. The Painting's Fair Market Value

The Probation Office reports that the art gallery placed the retail value of the painting at the time of the theft at $110,000. PSR, ¶¶ 13, 29, 35. A valuation of $110,000 is consistent with the statement from Gretchen Holce, reported by the Probation Office, that she obtained an appraised value for insurance purposes of $90,000 on the painting in 2007 and, in her opinion, as an art collector, the value of the painting had increased by approximately $10,000 to $15,000. PSR, ¶¶ 16, 18. In addition, Government Hearing Exhibit 5 supports a valuation of $110,000. The Government's evidence shows another Tom Wesselmann painting, *Fouyr Brown Eyes Under Glass*, that was sold in 2007 by Christie's Art Auction House of London for $191,000. That painting was then resold by the Phillips Art Auction House of New York in 2017 for $250,000, reflecting a ten-year increase of approximately 31 percent. Beginning with the 2007 appraised value of $90,000 for the painting at issue, *Study of Monica with Tulips*, increasing that valuation by 31 percent over the same ten-year period results in a 2017 valuation of $118,000. This is further corroboration of the reasonableness of a valuation estimate of $110,000. In addition, beginning with the wholesale purchase price by Hollis Taggart Galleries in 2017 of $52,000, and applying the industry practice of "keystone" (or double) pricing for retail, this would yield a retail fair market value of $104,000, which also corroborates a valuation estimate of $110,000.

In contrast, Griffin offers a formal appraisal dated February 9, 2018, indicating that the Tom Wesselmann painting *Study for Monica with Tulips* has a fair market value of only $55,000.

This evidence is not persuasive. As discussed previously, no party disputes that the Hollis Taggart Galleries in New York City had offered to buy this painting in 2017 for $52,000, after confirming the painting as authentic and seeing it to be in excellent condition. Art galleries are in the business of buying art and reselling it at a profit, considering the gallery's costs, including acquisition costs, salaries, and general overhead. It, therefore, defies common sense that a New York City art gallery would be willing to pay $52,000 in 2017 for a painting created by an artist who died in 2004 (PSR, ¶ 11), if that painting less than one year later (the effective date of the appraisal is February 9, 2018) would have a fair market value at retail of only $55,000. Neither Griffin's formal appraisal nor his legal memorandum offers any explanation for this situation. Thus, the Court concludes that Griffin's valuation evidence is less persuasive than the evidence presented by the Probation Office, as contained in the PSR and the other evidence received in court during the sentencing hearing.

Also in contrast, the government offers a valuation letter from an art gallery in Portland, Oregon, opining that a reasonable and fair range of values for the painting at issue would be $150,000-$200,000. Griffin points out that a formal appraisal of fine art must have a specific number, not a range, and he also identifies other purported flaws in the government's valuation evidence. The Court, however, is not limited to considering an actual appraisal, but need only make a reasonable estimate of the loss. *See* U.S.S.G. § 2B1.1(b)(1), comment. (n. 3). There is, however, another flaw in the government's valuation letter. The author of that letter has misspelled the name of the artist. The government's letter refers to "Tom Wesselman." Every other reference to the artist, however, including the Indictment, the PSR, and Defendant Griffin's appraisal, refers to "Tom Wesselmann"—with two n's. Because the government's valuation letter signed by the government's art valuation expert contains both a misspelling of the artist's

name as well as a relatively broad range of estimated values, the Court concludes that the government's valuation evidence is less persuasive than the evidence presented by the Probation Office, as contained in the PSR.

## CONCLUSION

The Court concludes that it is appropriate to consider the intended loss both to the specific victim of the crime of conviction (*i.e.*, the New York art gallery), and to the owner of the stolen painting (*i.e.*, the trust), and to take the greater of these two values. The loss to the New York art gallery is $52,000. The loss to the owner of the stolen painting is the retail fair market value of the painting at the time of the theft, which is equal to its replacement cost. The Court has considered the evidence presented by the Probation Office in the PSR, as well as the evidence presented by Griffin and the government both before the sentencing hearing and at the sentencing hearing. The Court concludes that the retail fair market value of the painting at the time of the theft is $110,000. Thus, to the base offense level of seven the Court adds a specific offense characteristic increase of eight under U.S.S.G. § 2B1.1(b)(1)(E) (more than $95,000 but not more than $150,000), less two levels for acceptance of responsibility under U.S.S.G. § 3E1.1(a). This yields a total net offense level of 13. Based on Griffin's criminal history category of VI, which the parties do not dispute, Griffin's advisory sentencing guideline range is 33-41 months. The Court will address the other sentencing factors under § 3553(a) in open court after appropriate argument and allocution.

**IT IS SO ORDERED**.

DATED this 22nd day of May, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge